Good morning, your honors. May it please the court, my name is Chandra Russell and I represent the appellant Betty Benson in this case. I'd like to reserve four minutes for rebuttal, certainly. We are here today because the district court granted summary judgment for the defendants even though almost every single material fact about the encounter between Officer Pettis and Mr. Benson is in dispute. This case turns on the standard of review. The standard permits summary judgment only if, viewing the evidence in the light most favorable to Mr. Benson, there is no genuine issue as to any material fact and the defendants are entitled to judgment as a matter of law. Now it's clear that the district court did not have a very high opinion of Mr. Benson's version of the facts. Other courts may have thought differently, but none of that matters in this case. What matters is Mr. Benson's version of the events. Making all clear in this case is that he was a victim of racial profiling by the San Jose Police Department. One of the key questions for me with regard to the Fourth Amendment claim is whether the encounter was consensual, whether there are factual disputes regarding whether this was a consensual encounter. And so can you talk about some of the conflicts in the evidence regarding whether the main reason why this encounter was non-consensual, or at least that there's a disputed fact whether it was, is the retention of Mr. Benson's identification. It's unclear in the Ninth Circuit at this point, I'll direct the court's attention to the Osborne case, it's unclear whether the retention of identification constitutes a show of authority enough to convert an otherwise consensual encounter into detention. I thought the law, our law, was clear on that point, which is that if you retain the license beyond the time necessary, I guess, to run the checks, and then you engage in further investigative inquiry, at that point it becomes a seizure. Yes, Your Honor, exactly. So just pinpoint for me, in your view, when did the seizure, what was the moment that the seizure occurred on your client's version of the facts? The moment the seizure occurred was the moment that Officer Pettis took the identification into his hands, and there is a factual dispute that couldn't be more disputed, whether he took the identification in his hands or not. And we're required to credit? Yes, exactly. Okay, so the officer has the license, but under our law, that doesn't automatically convert this into a seizure. The officer is permitted to make the inquiry, so he gets on, what, his cell phone? Yes, Your Honor, he gets onto his cell phone, he calls in a warrants check, which is an inquiry under Chan Jimenez, which is the law that you're referring to. He proceeds then to make Mr. Benson wait on the sidewalk while this inquiry is going on. He doesn't tell Mr. Benson. Okay, so while he's on the cell phone, getting the information for the check, still no seizure, right? That, Your Honor, is where the seizure happens, is when he's conducting, yes. I thought you agreed with me that our law was clear that it doesn't become a seizure until after the officer completes the background check that he's trying to run with the license. The issue of retention of identification versus just asking the detainee or the potential detainee for identification is where the tension happens. Under, you know, case law that I believe you're referencing, mere asking for identification and investigating the person's identity is not a detention. That's true in INS versus Delgado. In this case, what happened is he, even though he checked Mr. Benson's identity by seeing his name on the identification card, he also asked him his reason for being there, not withstanding that he then knew that he was a resident of that neighborhood, had a purpose for being there. He continued to investigate Mr. Benson by conducting this warrants check and then following him onto the bus after that point. Okay, but I'm still having trouble with you pinpointing the point where you think a seizure occurred. And let me just tell you, under our law, it seems to me, there could not be a seizure until at the very earliest the officer completes the background check, so he makes the phone call, finds out it's clean, no warrants, no issues, and then holds on to the license and makes some further investigative inquiry. And I didn't see that happen here. And I guess that's what I'm hoping you can help me with. Sure, Your Honor. I think if we can look at the Chan-Gimenez facts, and then maybe that will help. In that case, the officer stopped Chan-Gimenez, took his identification, and the further inquiry that the court was referring to was looking, asking the detainee for further information, and then proceeding to conduct a search of his truck. So it says, can I have your license? Gives him the license. He goes, does the check. We said still no seizure. The check is completed. At that point, the officer says, hey, you mind if I look in the truck? Without giving the license back. So the guy, he can't leave, right? I mean, that's what we said is the seizure. Here, what I, as I understand it, the completion of the background check occurred almost simultaneously as the bus that Mr. Benson was waiting for pulls up. He was going to get on that bus anyway, right? Your Honor, that's correct. I'd also point out that when the results came back is in dispute. It's not clear where he was when those came back. Under even Officer Pettis' version, and also Harpal Singh, the bus driver, he doesn't recall there being any information from the radio being emitted at the time they were on the bus. So there's a factual dispute that, and by that, quote-unquote, objective observer's perception, that the drawing all inferences there, he still got onto the bus in front of Mr. Benson. So let's say that the check comes back clean. They're still standing on the sidewalk. The bus is now approaching. I think the undisputed testimony is that the officer asked, is this the bus you were waiting for? Correct. Mr. Benson says yes. So the officer flags down the bus. What's the additional investigative inquiry that occurs after that point? The following him onto the bus. There was no reason to do that. And I think one of the issues in this case, and one thing that leans towards the detention as well, is that he never explained the reason to Mr. Benson for what he was looking into. By the time he followed Mr. Benson onto the bus, had the ID already been returned? That is a disputed material fact in our view. I think we have to assume that it was not returned. It wasn't returned, according to Mr. Benson, until he was already seated on the bus. Correct. But as I understand our case law, there would still need to be some further investigation that the officer is trying to conduct once they're on the bus and he still has the license. And I don't I don't remember your client ever saying that there was any further questions put to him. It was just, hey, this is the bus you want to get on, let me... Your Honor, in Chan Jimenez, the difference was that it was expressed what the purpose was for him to keep him there. In other words, he said, may I look into your truck? We don't have that specific inquiry from the officer. But again, the fact that he leans more in favor of a detention just because he didn't explain to him, look, I'm going to now do this inquiry. He didn't say that. He instead just continued to hold on to the identification and proceeded him to follow him onto the bus. So the fact that we don't know what further inquiry he was doing because the officer didn't say it, in our view, that shouldn't detract from the idea that this was not a consensual encounter. I'm not sure I follow. How could a reasonable jury on just on the fact you just described, how could they determine that there was some further investigation that was going on? The further investigation was him deciding to bring Mr. Benson onto the bus and hold the bus there. I don't think it's disputed that Mr., that Officer Pettis did require the bus driver to wait. Again, in our view, it's the lack of information about what it was he was doing with Mr. Benson. If he was just looking into Mr. Benson's identity and making sure he was rightly in the area, he wouldn't have needed to take the identification in the first place. Mr. Benson explained to him the reason for being there and told him that he was in the neighborhood. So the further investigation is following him onto the bus, despite having his whatever idea he was trying to get from the warrants check dispelled by that point. And, Your Honor, I would draw us back to the totality of circumstances test. Even though this might not be on all fours with Chan Jimenez or the other authorities, we have to look at the totality of circumstances here. And one of them that bears mention is Mr. Benson's disability. He was an elderly man. He's passed away after this lawsuit was filed. He was someone that was unable to articulate resistance. He couldn't write on a piece of paper for the officer, why do you need my identification anymore? You know, why do I need to go on the bus with you? He wasn't able to do any of that. And under Supreme Court authority, we are entitled to look at the attributes of the detainee to consider whether a seizure or a detention under the Fourth Amendment occurred. Well, he was ordered to stay where he was per his testimony. Yes. Yes, Your Honor. He was ordered to stay where he was, combined with the fact that... And not told that he was free to leave. You're right. Exactly, Your Honor. And he couldn't have left because the officer had his driver's license. Correct. Correct. And again, the question is, would a reasonable person in these circumstances feel free to leave? Would a reasonable person, knowing everything that we know about Mr. Benson's circumstances, about the daylight encounter with no one else around, all of those things, in our view, really make it reasonable for a jury to conclude that given the totality of the circumstances, we have a nonconsensual encounter here. And the court clearly credited Officer Pettis' version of the events. That's why we're here today. But a totality of circumstances analysis necessarily weighs on credibility. In this case, we have a lot of issues with credibility that we haven't even discussed yet. After the fact, the officer provided several different justifications for why this happened. Yes. No. Let's get to that. That's on your 14th Amendment claim. We'll get to that in a second. But I guess I'm still having a hard time seeing... I don't see any factual dispute that's relevant to the Fourth Amendment claim. I think we have to, as you've said, we have to credit basically everything that Mr. Benson said and then the one aspect of the officer's testimony that's actually more favorable to your client on the Fourth Amendment claim. We have to credit... As I see the problem for you is that even if we credit all that, there's just... There's nothing that rises to the level of a Fourth Amendment seizure under our case law. It would have been different if Mr. Benson was at the point he was ordered to get on the bus, was ready to go back home. Then obviously I can understand the argument. He wouldn't feel free, since the officer still had his license, to disobey the officer's command to get on the bus and then walk somewhere else. But he was... That's what he wanted to do, right? He wanted to get on that bus. He did want to get on the bus, Your Honor, and that's what the district court said, is he was able to continue on with his day. That's not necessarily the question here, and that was based on some drug interdiction cases where the issue was a bus seizure. That's what he based that on. Here, the question is, was he... Would a reasonable person in these circumstances feel free to leave? In this case, that's definitely not something that we can decide when we take Mr. Benson's evidence as true. There are other shows of... But you say to leave, in this context, right? It just seems... Well, what does that mean? Correct. To get on the... Well, but he wanted to get on the bus. It's just like the bus passenger who's already sitting there, and that's why the court has this kind of different analysis. Well, you want to be there, so we're not going to just ask, would you feel free to just get up and run off the bus? Because you're already there, and that's presumably what you want to be doing. Correct. In the bus cases, Florida versus Bostick and Drayton, they changed the test, and I misspoke. The test is, would a reasonable person in these circumstances feel free to terminate the encounter with the police officers and go about his business? This is a case where Mr. Benson, as he has testified to, felt like he wasn't entitled to do that. He wanted to go to the mall without being interfered with by a police officer, and he wasn't allowed to do that. And I think the evidence that we... I'd like to end so I can do some rebuttal, but the evidence shows that this was a pretextual stop, and he was not allowed, and a reasonable person would not feel that he was allowed to go about his business that day. Kim, before you sit down, can I just... I'm more troubled, actually, by the 14th Amendment claim, and... But Bingham seems to... Can I ask one question, counsel? You said that Mr. Benson had died. Yes, Your Honor. What part of his claim survived? I'm sorry, I wasn't able to understand. You said that your client is a thief. That's correct. What part of the claim survives his death? Mrs. Benson, Mr. Benson's wife, is continuing the lawsuit as his personal representative under the Ninth Circuit appellate rule. And the claim survives his death? Correct, Your Honor. This is an issue of whether constitutional rights have been violated, and that's a legal question, and it's something that, as his legal representative, she's able to continue. All right, thank you. Thank you. Judge Watford? Can you just address Bingham on the 14th Amendment claim? Yes, Your Honor. I'm glad you asked. So Bingham, when you take a very high level view of the case, says that what evidence they had of a 14th Amendment encounter in that case was that there was a black alleged detainee, there was a white police officer, and that there was a dispute as to reasonableness of the stop. In this case, we have more than that. In this case, we have post-facto justifications showing that there was some attempt to cover up. And actually, in Bingham, the district court, or excuse me, the Ninth Circuit affirmed the district court's factual finding that was expressed in that case, that there was no post-facto attempts to justify an otherwise sham arrest. That was the language in that case. Although they didn't reach, they ended up not agreeing on the... You're talking about the cover-up, you're talking about the call from the other person at the police station to Mrs. Benson? Correct. Correct. After the fact, saying, well, actually, this is a homeless person, that's why he stopped him. In Bingham, they expressly found that there was no issue of post- facto justifications. And the reason we have brought in the McDonnell Douglas test and other ways to look at this is that the Ninth Circuit and the Supreme Court have all wholeheartedly agreed that significant, substantial evidence of pretext is enough to sustain the burden on summary judgment, to show evidence of discrimination. But if we had followed the Title VII model in Bingham, it seems to me the plaintiff would have gotten past summary judgment. Because there was a very strong factual dispute on whether the officers stated reason for... It wasn't a traffic stop? He said the guy was driving erratically? Correct. Yes. Right. And the plaintiff rather said, no, I wasn't. I was driving perfectly fine. That's a totally pretextual reason. There was a factual dispute on that question. I would have thought if we had been applying the Title VII model that the plaintiff would have been... I agree. I think if they had applied the Title VII model, they probably would have... No, no. Which is what leads me to think that we rejected that. We're not following that model in the 14th Amendment kind of racial profiling context. The reason we think it applies in this case is there is this other evidence of pretext. There's these tests to look at intentional discrimination. There are alternative tests. There's no one way to look at an equal protection claim. Under Bingham, they didn't use that test probably because they didn't suggest it. Because there wasn't this significant substantial evidence of pretext. Here we do have that. And here, because of that, because of the factual circumstances in this case, we would argue that applying the McDonnell Douglas pretext analysis is helpful to the court. It's helpful to look at these facts. And it's helpful to help the court in its analysis of the Prima Fascia case. All right. Thank you. We took you over your time. So I'll give you a couple of minutes for rebuttal if you wish. Thank you. May it please the Court, Richard North for the appellants in this case. Your Honor, I very astutely wanted to try and pin down what the moment of seizure was that occurred in this case. And we got some different explanations for what the moment of seizure actually was. At first, we heard that there was a retention of the identification. That clearly does not meet the standard under the Harrison v. City of Oakland case, as well as other authorities. Then we heard it was the fact that Officer Pettis conducted a records check. Obviously, that doesn't meet the standard. And then finally, we heard that following Mr. Benson onto the bus constituted some kind of a further investigation. Of course, there's no point, no evidence in this case that at that point, any further communication occurred between Mr. Benson and Officer Pettis. Counsel, I'm not hearing you very well. Maybe you're not speaking into the microphone. I apologize, Your Honor. That's good. That's better. Is that better? That's much better. Thank you. Of course, there's no evidence of any further communication once they're on the bus between Mr. Benson and Officer Pettis, other than, sir, he will give you a ride. Okay. You're right. But maybe you could respond to counsel's argument that why don't we apply the standard from the bus cases, which is would the person have felt, you know, able to terminate the encounter. And I guess at the point where the record, let's assume that the records check has been completed on the sidewalk, the bus is approaching, the officer flags down the bus, he still has Mr. Benson's license. At that moment, if you asked Mr. Benson, hey, would you feel free to terminate this encounter and go on about your business, go do whatever you want, I suspect we would all agree that no, he wouldn't, because the officer still had his license. So why doesn't the seizure occur right there? Well, there are a couple issues that are implicated by that question. I think first, because this is a summary judgment case, Mr. Benson's testimony is that his ID was returned to him on the bus. In fact, he testified that... But I'm with you. But the officer obviously gives a different version. And I think our cases make clear that the plaintiff is actually able to pick and choose for purposes of surviving summary judgment, right? That's fine. If the records check is completed on the sidewalk, the real question becomes was there any further investigation that occurs while the ID is being held, because all the cases that are cited by the appellant, every single one of them involves some further inquiry while the ID is being held. In most of those cases were airport seizure cases where the ticket and the identification is being held. The suspect, if you will, is asked to go to a different location. Inquiries are made about the suitcases they have, whether they're engaged in drug trafficking. The Chan-Yemenes case, which was relied on so heavily here, is factually, very quickly factually distinguished. In that case, the officer conducted a further inquiry while the papers are being held. Well, granted, in this case, even looking at the factual allegations or testimony and the like that's most favorable to Mr. Benson, you don't have search of the luggage or anything like that. And I know that you're arguing in the alternative that there was reasonable suspicion for the stop. But setting that aside, per his version, here he is standing on the sidewalk, waiting for the bus. The police officer comes up to him, asks for ID or demands ID, didn't give him a choice of that. He turns over his ID, officer calls it in, orders him to stay where he's at so he can't go anywhere, retains the ID all the way up until the bus comes, follows him onto the bus, still doesn't return his ID. Why aren't those circumstances viewed in totality sufficient to make this a nonconsensual encounter? With all due respect, Your Honor, I know that it's something you've mentioned a couple times, that Mr. Benson was ordered to stay in place that actually is not supported by the factual record. Mr. Benson testified many times in his deposition that he was never, Officer Pettis never said anything to him that sounded in command or was unreasonably authoritative, was condescending or rude. Never told to stay where he was? No, that's correct, Your Honor. There's nothing that was said to Mr. Benson in order. And he was very clear about that. That appears on page 63, 71, 73 through 74, 84 through 85 of the administrative record. Now, the law allows officers to approach citizens without reasonable suspicion and request identification, request purpose negation, other kinds of communication without implicating a Fourth Amendment seizure. And I think there's a real risk when we take that away from officers. Oh, sure. And I'm not suggesting that officers don't have the right to approach anyone on the street or anywhere else and engage them in conversations and ask for ID. And so long as the person voluntarily consents, there's no problem. I'm viewing the evidence in the light that's most favorable to him, as we must at this stage. If there was evidence that conflicts with that, where the officer told him to stay where he was and retain his ID much longer than necessary under the law, there's no problem for summary judgment purposes. What we don't have in this case is any dispute over the fact that as soon as the record check is completed, the ID is returned, whether that occurred on the sidewalk or on the bus. Officer Pettis has that occurring on the sidewalk. Well, actually, Officer Pettis says he never takes the ID to begin with. But in any case, the record check is completed. The bus arrives. He escorts the gentleman onto the bus. Mr. Benson has that occurring on the bus. But there's no dispute that the ID was returned or there was no further inquiry after the record check was completed. You know, what we really have here is a case where you have a gentleman who is doing nothing wrong. He's standing on the sidewalk. Of course, it's also undisputed in this case that, in fact, Mr. Benson testified as much that Officer Pettis didn't know he was waiting for a bus at the time that he was first contacted. He's not doing anything wrong. He's standing there. He's embarrassed. He doesn't understand why the contact is taking place. Officer Pettis doesn't tell him why the contact is taking place. But that is not required under the law, under the INSV Delgado case. He's embarrassed. He's mortified. He's an upstanding member of the community who's not doing anything wrong. But that embarrassment and mortification does not a Fourth Amendment issue create. The law allows officers to approach citizens in the way that Officer Pettis did and make the inquiry that he did. In all respects, this ordering... Let me ask you this. You've emphasized that there was no further investigative inquiry made after the ID was returned. Yes. And I guess I'm trying to figure out, why does that matter for purposes of whether there's a Fourth Amendment seizure? It's the defining line between a consensual contact and a Fourth Amendment seizure. Even under the bust line of cases? Yes, absolutely. The difference between a case like Drayton, which we rely on, where the Drayton court, of course, said, this is where the officer approached and asked permission to search the passenger's bag in person. The passenger consented and contraband was found. And there was issue over whether the confinement of the bus created a Fourth Amendment issue. The Drayton case said no. That conflicts, of course, with the... It doesn't conflict, but it's different than the Florida v. Bostic case. I'm sorry, the Florida v. Bostic case is... Well, let me back up to the basic issue, which is the Florida v. Bostic discussion about what creates a Fourth Amendment seizure. And there are certain types of officer actions that create a seizure. And those are whether you have a brandishing of a firearm, you have multiple officers, you have police lights and sirens, you have clear commands where if a command... The implication is that if the command isn't followed, then there will be consequences. You don't have any of those factors in this case. Right. But you have a situation which... Tell me if you agree with this, that if we credit Mr. Benson's version of the facts, and the officer still has his license, he's not going to feel free to terminate the encounter, however broadly we want to define that, right? I don't think that's true. What you really have in the case law, for example, there is the Thompson case. And that's an 11th Circuit case that was cited by the other side. In that case, the individual was in his car when his driver's license was taken. And then an inquiry was made while the driver's license was being held. Now, in a car case, the court said, that individual cannot drive away in their vehicle while their license is being held for fear of being arrested for driving without a license. Mr. Benson could have said, officer, I need my license back. And if the officer says, I'm sorry, I'm keeping it, Mr. Benson is certainly free to walk away at that point without incurring any further legal issue. Really? You think that people just want to give up their driver's license like that and just walk off? Of course not. But in the Thompson case, it's distinguished from airport cases, even, where the officer approaches somebody in an airport, takes their ticket, and the can go to the counter and buy another ticket. Just the fact that the officer has taken the ticket doesn't create a formal issue. I think we treat licenses very differently. Whatever, I'm not familiar with that case you were just talking about. But I know we've treated licenses differently for good reason. People just don't, it's a valuable thing. You don't just want to walk off without it. Of course, Your Honor. So, I guess I'm still stuck, though, just coming back to my question. For purposes of a Fourth Amendment seizure, why would it matter whether the officer asks additional questions? Let's just say the officer decides, you know what, while you're standing there, unable to leave because you don't want to give up your license, I'm just going to hang out, eat the rest of my donuts, and have coffee. Just, you know, total disregard of your ability to go on about your business. You would say there's no And it lasts for half an hour. You're stuck there. There's no Fourth Amendment seizure? Of course that's a hypothetical. It's very different from the facts of this case. The idea behind the case law, and these are all the cases that are cited by the other side, is if the officer is holding identification and conducting a criminal inquiry, there is an implication in that scenario that the individual must answer the questions and is not free to leave. We simply don't have that situation here. All right. Do you want to address the 14th Amendment, Clayton? Sure, Your Honor. Thank you for giving me the opportunity. The 14th Amendment requires evidence that race was a motivating factor. It requires evidence of discriminatory treatment. It requires intent. There simply is no evidence of intent on the part of Officer Pettis in this case. The only evidence that was cited in this argument was that Sergeant Leninger called Ms. Benson and mischaracterized what was happening at the time, or at least mischaracterized it in a way that was offensive to Ms. Benson. There is no connection in the record between Officer Pettis and Sergeant Leninger. It could have been entirely speculative on Sergeant Leninger's part. Well, let me ask you this. Why couldn't a reasonable jury presented with, again, let's say they have to, we're taking Mr. Benson's version of the facts as true, okay? He's not leaning over the fence. He's standing there waiting for the bus, just as you've conceded. Upstanding member of the community, going about his business, doing nothing wrong. The officer comes up, makes this stop, I don't know if you want to call it a stop, but initiates this encounter, gives a reason that's been shown to be flat-out false. Because if the jury believes Mr. Benson, Officer, what is his name, Pettis? Pettis. Has been shown to be a liar. Why couldn't the jury just from that infer that, well, if in fact race wasn't involved in this, why would the officer have made up this phony reason that we have concluded is because the law requires something more than speculation and supposition when it comes to intent to discriminate. And that's why you have the line of cases that say that just because the officer is white and the suspect or the person who stopped is a minority, even if they're in a majority white neighborhood, just that simple set of facts does not allow for an inference under the law when it comes to summary judgment. I agree with you on that, if that's all we had. But in the Title VII context, we most certainly say that if the plaintiff is able to show that the stated reason, stated race-neutral reason is pretextual, that is enough, especially to get past summary judgment for a reasonable jury to infer that, oh, well, if you gave a pretextual reason, looking at the rest of the circumstances as you described them, maybe race was the reason for the stop. Well, we certainly disagree that the Title VII analysis applies in this case. Why wouldn't it? It seems like it's exactly the same kind of issue we're trying to get at. Why wouldn't we apply Title VII? Because in order to survive summary judgment, what you need is a material dispute of fact. And in this case, whether Mr. Benson is simply standing there or whether he is leaning over the fence is not a material dispute of fact. And the reason for that is Penal Code Section 653-BA, which prohibits loitering about any school or public place where children attend or congregate. And the definition of loitering is as simple as delay or lingering without lawful reason. I think you're missing the point entirely. In the Title VII context, if the employer, let's say, gives a stated race-neutral reason for the adverse employment action, and that is shown to be pretextual, that alone, we've held, is enough for the plaintiff to get to the jury. It doesn't matter if there might have been some other reason that the employer could have given that would have been legitimate. The fact is that the reason they gave has been shown to be a lie. And from that, we say, juries could infer that, well, maybe the illicit motive really was driving the decision. Well, it hasn't been shown to be pretextual in this case. I mean, we have a – If the jury believes Mr. Benson, it has been shown to be pretextual, right? You disagree with that? I think juries can find all kinds of things. I think this case is driven by the Fourth Amendment issue. If you have a consensual contact, there's no Fourteenth Amendment implication. We're talking about the Fourteenth Amendment claim here. Yes, Your Honor. And put aside whether there was a Fourth Amendment seizure, there's just an initiation of this contact, which Mr. Benson alleges was purely driven by race. I have yet to see any authority that allows a Fourteenth Amendment issue to proceed where there is no Fourth Amendment seizure. If it's a Fourth Amendment issue, it all really here hinges on the Fourth Amendment issue. So you think that if – okay. I mean, certainly the racial profiling cases that I'm remembering, they do involve some kind of Fourth Amendment activity. But you think that, under your analysis then, police can just, purely on a racially motivated basis, just randomly initiate consensual encounters, and that's perfectly okay? Of course not. If you have racial motivation, that's a problem. But there's no evidence of that in this case. But I guess we're just going in circles. Because I'm saying if we applied the Title VII framework, there is evidence from which a jury could infer that, in fact, race was the motivating factor. Because the stated race-neutral reason that was given is shown to be protection. I don't mean to go in circles. Again, our position is that this hinges on the Fourth Amendment issue, A, that it's a consensual contact. But even if not, there's a reasonable suspicion under PC 635bA. And if there is either of those things, either of those things exist, there's a consensual contact or there's reasonable suspicion, then there is no Fourteenth Amendment implication. All right. You're over your time. Thank you, counsel. Thank you. If I may, I just wanted to clarify what I meant initially when I was talking about the Osborne case and kind of what the law is in this circuit on the retention of identification. The court was correct that Chan Jimenez said that there is a seizure when there is retention of identification plus further inquiry, which, as I mentioned, that is what we argue is happening in this case. The Osborne case looked at whether retention of the identification alone was enough to be considered a seizure without that additional show of authority, and it declined to rule on that issue. So it's fair game, for your honors, whether that in itself would be a detention without further inquiry. additional show of authority. Because I think officers, as counsel argued, can approach anyone and say, can I see your I.D.? Do you have any I.D. on you? And they don't have to tell you, by the way, this is a voluntary encounter. They come up to you and they say, do you have I.D.? Can I see your I.D.? And you turn it over. That, I think, is a consensual encounter under the case law. But that coupled with something else might not be a consensual encounter when you look at the totality of the circumstances, such as, in the case law gives examples of this, an additional show of force, commanding somebody to go somewhere with the officer, or in the case of a chant menace, searching the person's possessions or questioning the person further without any reasonable suspicion. So is the additional show of authority that you're relying on in this case the asking of the I.D. plus having him stay where he's at and then retaining the I.D. all the way up until he gets on the bus? Yes, Your Honor. It's those incidences of directing or instructing, however you want to use the term. And contrary to what counsel said, there is evidence in the record that he was instructed to do these things. He was directed to take a seat on the bus. That's in page 74 and 75. The bus driver corroborates this on page 163. And there's also evidence that Officer Pettis told the bus driver to wait. So that's page 81. If I may address the Thompson issue of the license and whether it matters if the person is able to drive away, the Rodriguez-Sanchez case, which is one that both parties rely on, that involved a student who was her bus pass as a student was taken from her. And the court there said that the retention of the identification and taking it to the car to run a warrants check did turn that encounter into a seizure. So I don't think it does hinge on whether it was a driver's license or airline ticket or whatever. All right. We have your arguments. Thank you very much, counsel. Counsel for both sides. Thank you. The matter is submitted.
judges: Noonan, Nguyen, Watford